## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JEREMY CALLAN, | CASE NO. 1:21-cv-01479 |
| Plaintiff, | |
| -vs- | JUDGE PAMELA A. BARKER |
| AUTOZONERS, LLC, | MEMORANDUM OPINION AND |
| Defendant. | ORDER |

Currently pending is Defendant AutoZoners, LLC's ("AutoZone") Motion to Dismiss Plaintiff's Complaint.  (Doc. No. 4.)  Plaintiff Jeremy Callan filed a Brief in Opposition on September 3, 2021, to which AutoZone replied on September 16, 2021.  (Doc. Nos. 9, 10.)  For the following reasons, AutoZone's Motion to Dismiss IS GRANTED in part and DENIED in part.  The remainder of the case is REMANDED to the Court of Common Pleas of Cuyahoga County, Ohio, from which it was removed.

## I.     Background

Callan worked for AutoZone as a Parts Sales Manager from August 22, 2016 through July 21, 2020.  (Complaint, Doc. No. 1-1, ¶¶ 13-14, 119.)  Throughout his employment with AutoZone, he worked in various AutoZone stores across northeast Ohio.  (*Id.* at ¶ 15.)

In November 2017, Callan informed an AutoZone human resources representative that he planned to take an extended vacation with his wife in either September or October 2020 to celebrate their honeymoon.  (*Id.* at ¶¶ 16-17.)  Callan alleges that he began discussing his honeymoon trip with AutoZone's human resources department three years in advance to ensure that he had no issues obtaining the necessary time off.  (*Id.* at ¶ 18.)  In November 2017, AutoZone's human resources

representative told Callan that he would be able to take the necessary time off to enjoy his honeymoon in 2020.  (*Id.* at ¶ 20.)  Callan communicated frequently with his managers about his honeymoon throughout 2017, 2018, and 2019, to ensure they remembered that he should receive the necessary time off for his honeymoon.  (*Id.* at ¶ 25.)  According to Callan, he told David Freeman and William Keller, both AutoZone managers and/or supervisors, about his planned honeymoon at some point between 2017 and 2019.  (*Id.* at ¶¶ 25-29.)

According to Callan, he suffers from anxiety.  (*Id.* at ¶ 22.)  On March 15, 2018, Callan received leave pursuant to the Family Medical Leave Act to address his anxiety.  (*Id.* at ¶¶ 22-23.)  Callan alleges that AutoZone became aware that he suffered from anxiety due to his 2018 FMLA leave.  (*Id.* at ¶ 24.)

On January 1, 2019, Callan was working with Patrick Stienstra, an AutoZone "manager and/or supervisor," and Angela Green, an AutoZone employee.  (*Id.* at ¶¶ 30-31.)  While working together, Callan alleges that he overheard Stienstra comment to Green that Stienstra was happy that Green wore yoga pants without underwear and instructed her to continue not wearing underwear while she worked.  (*Id.* at ¶ 34.)  Callan claims that he "made clear" to Stienstra that he disapproved of Stienstra's comments towards Green.  (*Id.* at ¶ 35.)  In response, Stienstra allegedly became aggressive and confrontational towards Callan, including berating Callan in front of other coworkers and customers and making derogatory comments towards Callan.  (*Id.* at ¶¶ 37-39.)  On January 20, 2019, Callan sent an email to AutoZone's human resources department, complaining about Stienstra's aggression and informing the department of Stienstra's January 1, 2019 comments towards Green.  (*Id.* at ¶¶ 50-51.)

In May 2019, Callan transferred to a different AutoZone store.  (*Id.* at ¶ 54.)  Before and after his relocation, Callan continued reminding AutoZone about his planned honeymoon trip.  (*Id.* at ¶ 54.)  After Callan's May 2019 transfer, he informed Michael Vaughan, a "manager and/or supervisor" at Callan's new AutoZone store, that he planned to take an extended honeymoon trip and that his time off was already approved by AutoZone.  (*Id.* at ¶ 55-56.)  However, after his May 2019 transfer, Callan alleges that "Keller and Freeman made comments that made Callan believe that he would not be able" to take his honeymoon trip, which Callan "had already booked and paid considerable money for in reliance on" AutoZone's assurances that Callan would receive time off.  (*Id.* at ¶ 57.)

In August 2019, Callan sought reassurance that he would be able to take time off for his honeymoon without being terminated.  (*Id.* at ¶ 58.)  He reminded Keller, Freeman, and Vaughan that AutoZone's human resources department had previously communicated to him that he would be able to take time off for his honeymoon.  (*Id.* at ¶ 59.)  In response, Freeman and Vaughan told Callan "that they would not allow Callan" to take his proposed honeymoon trip.  (*Id.* at ¶ 60.)  Freeman told Callan that he would be terminated for excessive absences if Callan took his honeymoon trip as planned.  (*Id.* at ¶ 61.)

Callan alleges that AutoZone's reneging on giving him time off for his honeymoon was intended to cause, and did cause, him emotional distress.  (*Id.* at ¶¶ 70-71.)  Following AutoZone's reneging on giving Callan time off for his honeymoon, Callan received medical treatment for his anxiety and stress.  (*Id.* at ¶ 72.)  Callan alleges that he "qualified for leave under the FMLA," based on his treatment for anxiety.  (*Id.* at 73.)  Callan further alleges that, "[o]n or about September 12, 2019, Callan received FMLA leave because of his stress and anxiety."  (*Id.* at ¶ 74.)

According to Callan, after AutoZone reneged on providing him time off for his honeymoon, Freeman, Keller, and Vaughan told Callan that the only way he could travel on his honeymoon was if Callan took FMLA leave.  (*Id.* at ¶ 75.)  Callan alleges that AutoZone required Callan to use his September 12, 2019 FMLA leave "for reasons other than the stated purpose" of his leave.  (*Id.* at ¶ 76.)  Callan returned from his FMLA leave on December 5, 2019.  (*Id.* at ¶ 85.)

On March 22, 2020, the Ohio Department of Health issued a stay-at-home order in response to the onset of the COVID-19 pandemic.  (*Id.* at ¶ 90.)  The stay-at-home order directed businesses, employers, and individuals to take a variety of actions to prevent the spread of COVID-19 throughout Ohio, including directing businesses to allow sick employees to stay home to care for themselves, children, or other family members, and also directing at-risk individuals to take precautions regarding their health, including remaining in their home, unless they needed to seek medical treatment.  (*Id.* at ¶¶ 92-93.)  Callan alleges that, in accordance with Ohio's stay-at-home order, he asked AutoZone to reduce him to part-time status so that he could stay at home with his pregnant wife and avoid inadvertently transmitting COVID-19 to her because she was at-risk for COVID-19.  (*Id.* at ¶ 103.)  AutoZone granted Callan's request and agreed to schedule him as a part-time employee.  (*Id.* at ¶ 104.)  However, AutoZone never scheduled Callan to work another shift.  (*Id.* at ¶ 106.)  On August 24, 2020, AutoZone notified Callan that it had removed him from its employee system on July 21, 2020.  (*Id.* at ¶ 118.)  Thus, Callan alleges that AutoZone effectively terminated his employment on July 21, 2020.  (*Id.* at ¶ 119.)

Callan filed the instant lawsuit in Cuyahoga County Court of Common Pleas on June 25, 2021, which AutoZone removed to this Court on July 29, 2021.  (Doc. No. 1.)  Callan alleges four claims against AutoZone: (1) Unlawful interference with FMLA rights; (2) Retaliation in violation

of the FMLA; (3) Retaliation in violation of Title VII; and (4) Wrongful termination in violation of Ohio public policy.  (Doc. No. 1-1, ¶¶ 139-68.)  AutoZone filed its Motion to Dismiss on August 4, 2021.  (Doc. No. 4.)  Callan filed his Opposition to AutoZone's Motion on September 3, 2021.  (Doc. No. 9.)  AutoZone filed a Reply in Support of its Motion on September 16, 2021.  (Doc. No. 10.)  Thus, AutoZone's Motion is now ripe for a decision.

## II.    Standard of Review

AutoZone moves to dismiss Callan's Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Under Fed. R. Civ. P. 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the Complaint in the light most favorable to the plaintiff.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  *Bassett v. National Collegiate Athletic Ass'n*., 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly*, 550 U.S. at 555-56, 127 S.Ct. 1955).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  Deciding whether a complaint

states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)) (quoting *Twombly,* 127 S.Ct. at 1964). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937.

III.    **Analysis**

First, the Court will briefly address whether it can consider several exhibits appended to AutoZone's Motion. In support of its Motion, AutoZone attached a sworn declaration from William Keller, Regional Human Resources Manager for AutoZone's Cleveland region. (Keller Decl., Doc. No. 4-2, ¶ 2.) Keller attached five exhibits to his declaration:

Exhibit 1: 1/20/2019 email from Callan to AutoZone

Exhibit 2: 3/30/2020 email chain between Callan, Keller, and David Freeman, with the subject "Quarantine Extension"

Exhibit 3: 4/25-5/1/2020 email chain between Callan, Keller, and Freeman, with the subject "Moving"

Exhibit 4: 5/1/2020 letter from AutoZone to Callan approving Callan for a personal leave of absence

6

Exhibit 5: 6/26/2020 letter from AutoZone to Callan notifying him that his personal leave of absence ended on 6/8/2020

(Ex. 1 – 5 to Keller Decl., Doc. No. 4-2, PageID# 65-78.)

Callan argues that, in ruling on AutoZone's Motion to Dismiss, the Court may not consider the communications between Callan and Keller regarding his 2020 absences because his Complaint mentioned no such correspondence. (Doc. No. 9, PageID# 153.) Callan does not address whether the Court may consider his 1/20/2019 email.

In ruling on a Rule 12(b)(6) motion, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430. *See also Brent v. Wayne County Dep't of Human Services*, 901 F.3d 656, 694 (6th Cir. 2018) (same); *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) ("This circuit has further 'held that documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.'").

The Court concludes that it may consider Exhibit 1, Callan's 1/20/2019 email to AutoZone. First, Callan specifically references his 1/20/2019 email throughout his Complaint. (Doc. No. 1-1, ¶¶ 49-52, 78, 107, 120.) Second, Callan's 1/20/2019 email is central to his claims because it contains what Callan characterizes as his opposition to Stienstra's alleged harassment. (*Id.* at ¶¶ 49-52.)

However, the Court concludes that it will not consider Exhibits 2 through 5. Although these exhibits appear to be central to Callan's wrongful termination claim, Callan does not specifically reference any of this correspondence in his Complaint. Consequently, the Court will not consider these exhibits in ruling on AutoZone's Motion. *See, e.g., Barrio Bros., LLC v. Revolucion, LLC*, No.

1:18-CV-02052, 2019 WL 5213039, at *4 n.1 (N.D. Ohio Oct. 16, 2019) (declining to consider certain email communications not referenced in the complaint); *Cronin v. Kaivac, Inc.*, No. 1:19-cv-758, 2021 WL 2334246, at *3 (S.D. Ohio June 8, 2021) (declining to consider certain emails appended to a motion to dismiss because the exhibits, while "clearly central" to the claims, were not specifically referred to in the complaint).  Further, the Court declines to convert AutoZone's Motion into one for summary judgment by considering the exhibits.  *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### A.    Callan's FMLA Claims

The FMLA "guarantees 'eligible employees' twelve weeks of unpaid leave during any twelve month period for certain family or medical events . . . ." *Staunch v. Continental Airlines, Inc.*, 511 F.3d 625, 629 (6th Cir. 2008).  The FMLA prohibits qualifying employers from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise any right provided" by the FMLA. *Novak v. MetroHealth Medical Center*, 503 F.3d 572, 577 (6th Cir. 2007) (citing 29 U.S.C. § 2615(a)(1)).  An employer also cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." § 2615(a)(1)-(2).  The Sixth Circuit "recognize[s] two discrete theories of recovery under the FMLA: (1) the so-called "interference" or "entitlement" theory arising from § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising from § 2615(a)(2)." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012).  Callan alleges both FMLA interference and retaliation.  The Court addresses each below.

8

### 1.    Count 1: FMLA Interference

In Count 1, Callan alleges that AutoZone unlawfully interfered with his FMLA rights when it threatened to terminate Callan's employment unless he used his granted FMLA leave, instead of his approved time off, to travel on his honeymoon.  (Doc. No. 1-1, ¶¶ 143-44.)  AutoZone argues that Callan fails to state a claim for FMLA interference because he never alleges that he was denied FMLA leave and/or that he was harmed by such a denial, but to the contrary, alleges that he sought and received FMLA leave from AutoZone on multiple occasions.  (Doc. No. 4-1, PageID# 49.)  In his Opposition, Callan argues that AutoZone interfered with his FMLA rights under an "involuntary-leave" theory, i.e., that AutoZone forced Callan to take FMLA leave in September 2019, rendering Callan without any available FMLA leave in March 2020 when he requested to work part-time.  (Doc. No. 9, PageID# 150-51.)  In its Reply, AutoZone counters that Callan's claim is not that he was forced to take FMLA leave for a non-serious medical condition, but that Callan was forced to go on his honeymoon during his FMLA leave for anxiety and stress, which is not a cognizable FMLA interference claim.  (Doc. No. 10, PageID# 163.)  Moreover, AutoZone argues that Count 1 should be dismissed because Callan did not qualify for FMLA leave in March 2020, and also because Callan failed to allege that any request for FMLA leave was actually denied.  (*Id.* at PageID# 164-65.)  The Court concludes that Callan fails to state a FMLA interference claim for several reasons and, thus, grants AutoZone's Motion with respect to Count 1.

To state a claim for FMLA interference, a plaintiff must allege:

(1) [ ]he was an eligible employee as defined under the FMLA; (2) [his] employer was a covered employer as defined under the FMLA; (3) [ ]he was entitled to leave under the FMLA; (4) [ ]he gave the employer notice of [his] intention to take FMLA leave; and (5) [his] employer denied FMLA benefits to which [ ]he was entitled.

*Novak*, 503 F.3d at 572*.* (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

9

Further, an employee may have a FMLA interference claim based on an "involuntary-leave" theory "when an employer forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that precludes [him] from working." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007) (citing *Hicks v. Leroy's Jewelers, Inc.*, No. 98-6596, 2000 WL 1033029, at *3-4 (6th Cir. July 17, 2000) (unpublished), *cert. denied*, 531 U.S. 1146, (2001)).  In other words, "[a]n employer who forces an employee who does not have a job-restricting serious health condition—i.e., an employee who remains capable of performing all essential job duties—to take FMLA leave may improperly exhaust the twelve weeks of leave to which the employee is statutorily entitled each year." *Huffman v. Speedway LLC*, 621 Fed. App'x 792, 797 (6th Cir. 2015) (citations omitted).

However, "the injury to the employee's FMLA rights would remain inchoate unless [ ]he develops a serious health condition within a year and requests FMLA leave." *Id.*  Thus, an involuntary-leave claim "ripens *only* when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past." *Wysong*, 503 F.3d at 449 (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)) (emphasis added); *see also Huffman*, 621 Fed. App'x at 797.

In *Wysong*, the Sixth Circuit concluded that the appellant-employee did not have a viable FMLA interference claim under an involuntary-leave theory. *Wysong*, 503 F.3d at 448.  Although the employee alleged that the appellee-employer forced her to use her final three days of FMLA leave when the employee did not have a serious medical condition that prevented her from working, the employee failed to allege that she subsequently requested FMLA leave and that her employer denied the request because she had no further FMLA leave available due to her involuntary leave. *Id.*

Therefore, the court concluded that the employee could not, as a matter of law, prevail on her FMLA interference claim based on an involuntary-leave theory. *Id.* at 449; *see also, e.g., Huffman*, 621 Fed. App'x at 797 (affirming district court's dismissal of the plaintiff's involuntary-leave FMLA interference claim because plaintiff "never requested FMLA leave and so her involuntary-leave claim remains unripe."); *Lynn v. True North Mgmt., LLC*, No. 15-cv-2650, 2016 WL 6995290, at *5 (N.D. Ohio Nov. 30, 2016) (dismissing plaintiff's involuntary leave FMLA interference claim because she failed to allege that she sought any more FMLA leave after her initial 12 weeks were exhausted).

As an initial matter, it is unclear from the face of Callan's Complaint that he pleads an involuntary-leave FMLA claim. Callan alleges that he suffered from, and sought treatment for, his emotional distress and anxiety sometime between August and September 2019. (*Id.* at ¶¶ 71-74.) Callan further alleges that he qualified for, and received, FMLA leave on September 12, 2019 because of his ongoing treatment for stress and anxiety. (*Id.* at ¶¶ 73-74.) Thus, on the face of Callan's Complaint, there could be no FMLA interference because Callan had a serious medical condition for which he received FMLA leave. *Cf. Huffman*, 621 Fed. App'x at 797 ("An employer who forces an employee who **does not** have a job-restricting serious health condition—i.e., an employee who remains capable of performing all essential job duties—to take FMLA leave may improperly exhaust the twelve weeks of leave to which the employee is statutorily entitled each year.") (emphasis added).

Moreover, Callan alleges that AutoZone interfered with his rights under the FMLA when AutoZone required him to use his September 12, 2019 FMLA leave to travel on his honeymoon, rather than the stated purpose of his leave, i.e., to treat his anxiety. (Doc. No. 1-1, ¶¶ 76-77.) The Court agrees that this allegation plainly supports AutoZone's argument that Callan's FMLA interference claim is properly understood to be that AutoZone "forced" Callan to go on his

11

honeymoon during his FMLA leave.  (*See* Doc. No. 10, PageID# 163.)  Such a claim, that Callan was forced to travel on his honeymoon while on FMLA leave for a serious medical condition, is not a cognizable involuntary-leave claim.  *Huffman*, 621 Fed. App'x at 797.

However, even if the Court accepts Callan's assertion in his Opposition that AutoZone "required Callan to take FMLA leave for reasons unrelated to Callan's stress and anxiety," Callan's involuntary-leave FMLA interference claim nevertheless fails for three reasons.  (Doc. No. 9, PageID# 150.)  First, Callan never alleges that he sought *any* leave in March 2020.  Callan alleges *only* that he "asked Auto[Z]one to reduce Callan to part-time status so that he could stay at home with his pregnant wife and avoid transmitting COVID-19 to his pregnant wife, who was an at-risk individual."  (Doc. No. 1-1, ¶ 103.)  Nowhere in Callan's Complaint does he allege that he requested *any* type of leave, let alone FMLA leave, in March 2020.  An involuntary-leave claim is "ripe only when an employee seeks to take FMLA leave after the full amount of leave has already been exhausted wrongfully because of the actions of the employer."  *Lynn*, 2016 WL 6995290, at *5 (citing *Huffman*, 621 Fed. Appx. at 797; *Wysong*, 503 F.3d at 449).  According to the Complaint, Callan never requested any type of leave, FMLA or otherwise, in March 2020.  Therefore, Callan's involuntary-leave claim is not ripe and fails as a matter of law.  *See Wysong*, 503 F.3d at 449.

Moreover, Callan's involuntary-leave claim fails because he never alleges that AutoZone ever denied any leave request in March 2020 on the grounds that Callan had previously exhausted his FMLA leave for the year.  The question is not whether AutoZone forced Callan to use FMLA leave, but whether AutoZone forced Callan "to take FMLA leave, and then, at a later date, denied [him] additional FMLA leave on grounds that [ ]he had already used up [his] allotment for the year."  *Vonderhaar v. Waymire*, 797 Fed. App'x 981, 991 (6th Cir. 2020) (citing *Wysong*, 503 F.3d at 449).

12

Here, Callan never alleges that AutoZone denied any leave request in March 2020 because Callan previously exhausted his FMLA leave in September 2019.  Thus, Callan's interference claim further fails as matter of law.

Finally, even if the Court assumes *arguendo* that Callan's request for part-time status could be understood as an unspoken request for FMLA leave, Callan's claim still fails because he was not entitled to take FMLA leave in March 2020 for the reasons alleged in his Complaint—namely, his wife's pregnancy and corresponding concerns about COVID-19.  The FMLA protects employees who require temporary leaves of absence due to a serious health condition or to care for a spouse, child, or parent with a serious health condition, among other reasons.  29 U.S.C. § 2612(a)(1).  The FMLA defines a "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  § 2911(11).  In March 2020, the Emergency Family and Medical Leave Expansion Act ("EFMLEA") amended the FMLA to extend FMLA leave to an employee who had been employed for at least 30 calendar days "because of a qualifying need related to a public health emergency in accordance with section 2620 of this title."  § 2620(a)(1)(A)(i); § 2612(a)(1)(F).  Section 2620 defines a "qualifying need related to a public health emergency" to mean that "the employee is unable to work (or telework) due to a need for leave to care for the son or daughter under 18 years of age of such employee if the school or place of care has been closed, or the childcare provider of such son or daughter is unavailable, due to a public health emergency."  § 2620(a)(2)(A).  The term "public health emergency" "means an emergency with respect to COVID-19 declared by a Federal, State, or local authority."  § 2620(a)(2)(B).

13

Callan does not allege any facts to suggest that he either was unable to work because he needed to care for a child whose school or place of care was closed or because he and/or his wife had a serious health condition that would have rendered him qualified to take FMLA leave in March 2020. The EFMLEA does not provide that a fear of contracting and/or transmitting COVID-19 to an at-risk person is a "qualifying need related to a public emergency." *See* § 2620(a)(2)(A). Moreover, a fear of contracting COVID-19 and/or transmitting COVID-19 to an at-risk person is not a "serious health condition" that requires inpatient hospital care and/or continuing treatment by a healthcare provider, as defined by the FMLA. *See, e.g., Milman v. Fieger & Fieger, P.C.*, --- F. Supp. 3d ---, 2021 WL 2284445, at *4 (E.D. Mich. Jun 4, 2021) (concluding that the plaintiff did not plausibly allege that her toddler son, who was susceptible to respiratory infections, and had fallen ill in March 2020 with a cough, runny nose, and gastrointestinal issues, suffered from a "serious health condition," as defined by the FMLA).

Callan's suggestion in footnote 48 that he was entitled to take FMLA leave in March 2020 because the FMLA permits leave to care for a spouse "if she has a 'serious health condition,' *or because of a qualifying exigency*" is meritless. (Doc. No. 9, PageID# 151, emphasis added.) Callan alleges no facts whatsoever to plausibly suggest that his wife suffered from a "serious health condition" that required inpatient hospital care and/or continuing treatment by a healthcare provider. § 2611(11); *see also Milman*, 2021 WL 2284445, at *4. Further, Callan takes the "qualifying exigency" language out of context. When read in context, § 2612(a)(1)(E) allows an employee to take leave "[b]ecause of any **qualifying exigency** (as the Secretary shall, by regulation, determine) **arising out of the fact that the spouse**, or a son, daughter, or parent of the employee **is on covered**

14

**active duty** (or has been notified of an impending call or order to covered active duty) **in the Armed Forces.**" § 2612(a)(1)(E) (emphasis added). Clearly, this provision is inapplicable here.

Accordingly, the Court concludes that Callan's involuntary-leave FMLA interference claim fails as a matter of law and should be dismissed.

### 2. Count 2: FMLA Retaliation

In Count 2, Callan alleges that AutoZone unlawfully retaliated against him for taking FMLA leave when it failed to schedule him on a part-time basis in March 2020 and also when it terminated his employment on July 21, 2020. (Doc. No. 1-1, ¶ 148.) AutoZone argues that Callan fails to state a claim for FMLA retaliation for two reasons. (Doc. No. 4-1, PageID# 50.) First, AutoZone argues that the contents of Exhibits 2 – 4 to the Keller Declaration demonstrate that AutoZone's decision not to schedule Callan after March 2020 was not an adverse action. (*Id.* at PageID# 50-51.) Second, AutoZone argues that the ten-month gap in time between when Callan took FMLA leave and when AutoZone terminated Callan's employment is insufficient as a matter of law to establish a causal connection between the two events. (*Id.* at PageID# 51.) In his Opposition, Callan reiterates that the Court should not refer to Exhibits 2 – 4, as they contain material outside the pleadings. (Doc. No. 9, PageID# 153.) Callan also argues that he need not prove his case at the pleading stage and so while his "claims may fail on temporal proximity alone, other evidence, which seems available, may countenance a valid FMLA-retaliation claim." (*Id.* at PageID# 154.) In its Reply, AutoZone argues that Callan concedes that the 10-month gap between taking FMLA leave and the termination of his employment negates any inference of causation, and also that he fails to point to any other allegation to suggest that his July 2020 termination was related to his taking FMLA leave in September 2019. (Doc. No. 10, PageID# 167.) AutoZone's argument that Callan suffered no adverse employment

15

action, which is premised solely on the contents of Exhibits 2 – 4, is unavailing because the Court

will not consider these exhibits at the pleading stage. *See supra*. However, the Court agrees with

AutoZone that Callan's FMLA retaliation claim fails as a matter of law because he does not plausibly

allege any causal connection between his protected FMLA activity and AutoZone's alleged adverse

employment actions.

> To state a claim for FMLA retaliation, a plaintiff must allege facts sufficient to establish that:
>
> (1) [H]e was engaged in a statutorily protected activity; (2) [the defendant] knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action.

*Seeger*, 681 F.3d at 283.

> With respect to the causal connection requirement, the Sixth Circuit has recognized that, in

certain cases, "where the temporal proximity between the protected activity and the adverse

employment action is acutely near in time, that close proximity is deemed indirect evidence such as

to permit an inference of retaliation to arise." *Seeger*, 681 F.3d at 283 (internal quotations omitted);

*see also Clark v. Walgreen Co.*, 424 Fed. App'x 467, 473 (6th Cir. 2011) ("Further, the court correctly

credited the temporal proximity of [the plaintiff's] leave and his firing as sufficient evidence of a

causal connection between the two. Our precedents stand for the principle that timing matters.");

*Mickey v. Zeilder Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("temporal proximity between

the events is significant enough to constitute evidence of a causal connection for purposes of

satisfying a prima facie case of retaliation"); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007)

(temporal proximity may constitute evidence of a causal connection). While a plaintiff's burden for

pleading causation is minimal, a plaintiff must still "put forth some credible evidence that enables the

court to deduce that there is a causal connection between the retaliatory action and the protected

activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).  Ultimately, a plaintiff must plead enough facts to "allow[ ] the court to draw the reasonable inference that the defendant" retaliated against him for exercising a right.  *Iqbal*, 556 U.S. at 678.

In *Flint v. Mercy Health Regional Med. Center*, the court concluded that the plaintiff plausibly alleged a causal connection based solely on the temporal proximity between her protected FMLA activity and her termination.  *Flint v. Mercy Health Regional Med. Center*, No. 1:19-cv-610, 2019 WL 6270916, at *3 (N.D. Ohio Nov. 25, 2019).  The court observed that the plaintiff's "factual allegations occurred in approximately two months; the denial of FMLA leave and ultimate termination occurring within a few days."  *Id.*  The court concluded that these facts gave rise to an inference that the defendant retaliated against the plaintiff for her use of FMLA.  *Id.  See also, e.g., Lynn*, 2016 WL 6995290, at *6 (concluding that the plaintiff plausibly alleged a causal connection based on temporal proximity alone when she was fired the same day that she exhausted her FMLA leave).

Conversely, in *Denton v. Fairfield Med. Center*, the court concluded that the plaintiff failed to state a claim for FMLA retaliation.  *Denton v. Fairfield Med. Center*, No. 2:11-cv-0716, 2012 WL 2409224, at *4 (S.D. Ohio June 26, 2012).  The court observed that the plaintiff's complaint contained "no other facts relating to her termination," other than that she was terminated three weeks after she returned from FMLA leave.  *Id.*  The court noted that the plaintiff's complaint was devoid of allegations "of any other retaliatory conduct, such as being ha[r]assed or otherwise mistreated, from which the court could conclude that Plaintiff has alleged a sufficient causal connection between the exercise of her FMLA rights and either the termination or failure to rehire."  *Id.*  The court concluded

17

that "[w]ithout more than a temporal link between the exercise of a right and termination of employment, Plaintiff fails to plausibly allege the requisite causal connection." *Id.*

The Court concludes that Callan failed to plausibly allege any causal connection between his September 2019 FMLA leave and AutoZone's alleged adverse employment actions in March 2020 and July 2020. Although close temporal proximity between the exercise of a right and an adverse action alone *may* be sufficient to support a plausible allegation of a causal connection, the temporal proximity between Callan's FMLA leave in September 2019 and AutoZone's alleged adverse employment actions in March and July 2020 is far too distant to allow the Court to infer, based on temporal proximity alone, that AutoZone retaliated against Callan for taking FMLA leave. In *Flint*, the plaintiff alleged that she was terminated a few days after she requested FMLA leave. *Flint*, 2019 WL 6270916 at *3. In *Lynn*, the plaintiff was terminated the *very same day* that she exhausted her FMLA leave. *Lynn*, 2016 WL 6995290, at *6. In this case, however, the relevant events were not "acutely near in time" to one another but were separated by periods of six and ten months. *Seeger*, 681 F.3d at 283. The extended temporal distance between when Callan utilized his FMLA rights and when AutoZone allegedly stopped scheduling Callan for work, and when it terminated Callan's employment, negates any inference of a causal connection between these events.

Further, Callan pleads absolutely no facts to suggest that AutoZone sought to retaliate against him for utilizing his FMLA leave. Callan alleges only the dates that his FMLA leave began and ended, the approximate date on which he requested to work part-time, and the date of his termination. (*See* Doc. No. 1-1, ¶¶ 74, 85, 103, 118.) Like in *Denton*, Callan offers no other facts that might suggest a causal connection between his FMLA leave and the alleged adverse employment actions. *See Denton*, 2012 WL 2409224, at *4. While the Court is mindful that Callan need not prove his

18

entire case at the pleading stage, Callan alleges nothing more than distant temporal links between the exercise of his FMLA rights and the adverse employment actions. *Id.*

Accordingly, the Court concludes that Callan's FMLA retaliation claim fails as a matter of law and should be dismissed.

### B.    Count 3: Title VII Retaliation

In Count 3, Callan alleges that AutoZone unlawfully retaliated against him after he opposed conduct that he reasonably believed to constitute sex discrimination, in contravention of Title VII. (Doc. No. 1-1, ¶¶ 152-54.)  AutoZone argues that Callan fails to state a claim for Title VII retaliation because Callan has not alleged facts to "establish either that he engaged in protected activity and/or that his separation from the company was causally connected to his correspondence in January of 2019." (Doc. No. 4-1, PageID# 52.)  Callan counters that he pleaded sufficient facts to support a retaliation claim based on his opposition to *quid pro quo* harassment, rather than reporting a hostile work environment.  (Doc. No. 9, PageID# 155.)  Callan also argues that AutoZone's temporal proximity argument fails for the same reasons it fails with respect to his FMLA retaliation claim. (*Id.*)  Further, Callan asserts that Stienstra's aggression towards him was an adverse employment action.  (*Id.*)  The Court concludes that Callan fails to state a claim for Title VII retaliation.

Under Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Title VII also prohibits retaliating against employees who oppose unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a).  Title VII provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  "Thus, this section prohibits an employer from retaliating against an employee who has 'opposed' any practice by the employer made unlawful under Title VII; and prohibits an employer from retaliating against an employee who has 'participated' in any manner in an investigation under Title VII."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).

To state a claim for retaliation under Title VII, a plaintiff must allege sufficient facts to establish that:

> (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (internal quotations omitted).  As discussed above, while "the standard for pleading causation in a retaliatory discharge case is 'minimal,' the plaintiff must 'put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.'"  *Sizemore v. Edgewood Bd. of Educ.*, No. 1:19-cv-555, 2020 WL 1904726, at *6 (S.D. Ohio Apr. 17, 2020) (quoting *Dixon*, 481 F.3d at 333); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (requiring the plaintiff to put forth some fact that allows the court to infer that the adverse employment action would not have occurred without the employee first engaging in his protected activity).

The Court concludes that Callan fails to plausibly allege any causal connection between his allegedly protected activity in January 2019 and AutoZone's decision to terminate Callan's

employment in July 2020.  Again, Callan relies solely on the temporal proximity between his allegedly protected activity, the 1/20/2019 email, and the adverse employment action, his July 2020 termination, to plead a causal connection between the two events.  This attempt fails.  These events are separated by 18 months—an even greater amount of time than the events at issue in Callan's FMLA retaliation claim.  *See supra*.  Callan alleges no other facts to suggest any connection between his 1/20/2019 email and his termination in July 2020.  Callan's allegations do not create a plausible inference of causality based on temporal proximity alone.  *See, e.g., Sizemore*, 2020 WL 1904726, at *8-9 (concluding that the plaintiff failed to plausibly allege a causal connection between her protected activity and the adverse employment action because the events were separated by more than six months and the plaintiff alleged no other facts than temporal proximity); *cf. Finley v. Miami Univ.*, 504 F. Supp. 3d 838, 850 (S.D. Ohio Nov. 30, 2020) (concluding that the plaintiff's allegation that the adverse employment action occurred roughly three months after she filed an EEOC charge was "enough to nudge her claims over the line at the pleading stage, but not by much" with respect to pleading a causal connection between the two events).

Callan argues that he adequately pleaded a Title VII retaliation claim because he alleged that Stienstra became aggressive and confrontational after Callan made clear to Stienstra that he opposed Stienstra's comments.  (Doc. No. 9, PageID# 156.)  Callan's argument is meritless for two reasons.  First, Callan's 1/20/2019 email belies his allegations that he ever opposed Stienstra's unprofessional yoga pants comment to Stienstra himself, or that Stienstra became aggressive as a result of Callan's opposition.  (*See* Doc. No. 4-2, PageID# 66-68.)  Callan's 1/20/2019 email is comprised of several single-spaced pages in which he sets out a litany of complaints about Stienstra's unprofessional, erratic behavior.  (*Id.*)  In the third from last paragraph, Callan recounts Stienstra's "yoga pants"

21

comment in a markedly different way from the allegations in his Complaint.  In his email, Callan writes that he noticed Green wearing yoga pants and informed another AutoZone employee, Michael, about her uniform infraction while she was out of earshot.  (*Id.* at PageID# 68.)  According to Callan:

> Patrick was nearby enough to hear my concerns and decided to say he appreciates the fact that she doesn't wear underwear with her yoga pants and asked why I don't want to see that all day.  **I was without words at this point, shook my head disapprovingly and uncomfortably stayed silent and kept to myself until Patrick left early that day.**  As soon as he was gone[,] I told Michael that I no longer wanted to work with Patrick because of the manner in which Patrick talks about and to other employees, creating this uncomfortable and hostile work environment.

(*Id.*, emphasis added.)  According to Callan's own description of the event, Callan did nothing to register his disapproval of Stienstra's comments beyond shaking his head and staying silent.  (*Id.*)  Further, Callan's 1/20/2019 email contains absolutely no description of Stienstra "berating" or "making derogatory comments" to Callan in response to Callan's supposed "disapproval" of Stienstra's yoga pants comment.  (*Compare* Doc. No. 1-1, ¶¶ 38-39 *with* Doc. No. 4-2, PageID# 68.)  This directly contradicts Callan's Complaint, in which he alleges that his 1/20/2019 email "included informing Auto[Z]one about Stienstra's Aggression."[1]  (Doc. No. 1-1, ¶ 50.)

Second, even if the Court assumes that Stienstra *did* become aggressive and confrontational towards Callan following his "opposition" to Stienstra's yoga pants comment—despite no mention of such opposition *or* aggression in his 1/20/2019 email—such behavior is not an adverse employment action.  In the retaliation context, "an adverse employment action . . . is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace," but instead "protects employees from conduct that would have

---

[1] No doubt in Callan's 1/20/2019 email, he describes several *other* instances in which Stienstra behaved aggressively, unprofessionally, and/or rudely to Callan and/or other AutoZone employees.  (*See* Doc. No. 4-2, PageID# 66-68.)  None of these instances stemmed from Stienstra's yoga pants comment in any way.

'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Hawkins v. Anheuser-Busch*, *Inc.*, 517 F.3d 321, 345 (6th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  However, the Supreme Court in *Burlington* also observed that Title VII's "antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms," but that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington*, 548 U.S. at 68 (internal citations omitted).  Stienstra's alleged aggression and derogatory comments towards Callan demonstrate a lack of good manners on Stienstra's part, but his alleged outburst would not dissuade a reasonable worker from reporting purported discrimination. *See, e.g., Stewart v. Esper*, 815 Fed. App'x 8, 19-21 (6th Cir. 2020) (concluding that a supervisor's false accusations that the plaintiff would revoke other employees' computer access, the supervisor's ongoing offensive comments to the plaintiff, and the supervisor's refusal to permit the plaintiff physically enter a meeting in front of coworkers, among other actions, were not adverse employment actions in the context of the plaintiff's Title VII retaliation claim); *Coleman v. ARC Auto. Inc.*, 255 Fed. App'x 948, 953 (6th Cir. 2007) (concluding that management's comments meant to "undermine" the plaintiff's status as union president did not rise to the level of an adverse employment action in the retaliation context).  Moreover, Stienstra's alleged outburst on January 1, 2019 clearly did not dissuade Callan from reporting Stienstra's alleged harassment because Callan emailed AutoZone's human resources department a few weeks later to report Stienstra's yoga pants comment.  (Doc. No. 1-1, ¶¶ 49-51.)

Accordingly, the Court concludes that Callan's Tile VII retaliation claim fails as a matter of law and should be dismissed.

**C.      Count 4: Wrongful Termination in Contravention of Ohio Public Policy**

Having dismissed Callan's federal claims in Counts 1 through 3, the Court declines to exercise supplemental jurisdiction over Callan's remaining state law claim for wrongful termination in contravention of Ohio public policy.  (*See* Doc. No. 1-1, ¶¶ 160-68.)  Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction.  Additionally, "[i]n determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "[A] district court has broad discretion to decide whether to exercise jurisdiction over state law claims." *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 424 (6th Cir. 2015).  However, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996); *accord Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").

Here, the Court exercises its broad discretion in deciding not to exercise supplemental jurisdiction over Callan's remaining claim.  *Smith*, 603 F. App'x at 424.  As other courts have recognized, "[t]he interest in avoiding needless decisions on state-law issues as a matter of comity weighs heavily against supplemental jurisdiction." *Howell v. Buckeye Ranch, Inc.*, No. 2:11-cv-1014, 2013 WL 1282518, at *8 (S.D. Ohio Mar. 27, 2013); *see also Experimental Holdings, Inc. v. Farris*,

503 F.3d 514, 522 (6th Cir. 2007) (noting "the Supreme Court's general comity-related principle that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law"); *White v. City of Cleveland, et al.*, No. 1:17-CV-01165, 2020 WL 7640932, at *24 (N.D. Ohio Dec. 23, 2020). Callan's wrongful termination claim implicates questions of Ohio public policy surrounding the ongoing COVID-19 pandemic. The Court declines to delve into this state-law issue when it has dismissed all of Callan's federal claims. Moreover, considerations regarding judicial economy, convenience, and fairness do not outweigh these concerns, as this case has not progressed past the pleading stage.

Accordingly, the Court declines to exercise supplemental jurisdiction over Callan's remaining state law claim and denies AutoZone's Motion to Dismiss Callan's state law claim without prejudice to any right AutoZone may have to refile such a Motion upon remand to state court.

### D. Callan's Request to Amend Complaint

Callan requests that, if this Court grants AutoZone's Motion, it grant him leave to amend his Complaint. (Doc. No. 9, PageID# 149.) This request is denied. Callan chose not to amend his Complaint upon receipt of AutoZone's Motion to Dismiss. Moreover, Callan failed to follow the proper procedure for requesting leave to amend. A "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought . . . does not constitute a motion within the contemplation of Rule 15(a)." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 698 (6th Cir. 2004) (quoting *Confederate Mem'l Ass'n v. Hines*, 995 F.2d 295, 299 (D.C.Cir.1993) (*abrogated in part on other grounds*, *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011)). Finally, Callan does not argue that he could plead additional facts that would result in the denial of AutoZone's Motion to Dismiss. Accordingly, the Court denies Callan's request.

## IV.    Conclusion

For the reasons set forth above, AutoZone's Motion to Dismiss is GRANTED in part and DENIED in part.  To the extent Callan seeks leave to amend his Complaint, such leave is DENIED. The remainder of the case is REMANDED to the Court of Common Pleas of Cuyahoga County, Ohio, from which it was removed.

**IT IS SO ORDERED.**

                                              *s/Pamela A. Barker*

                                              PAMELA A. BARKER

Date:  January 24, 2022                      U. S. DISTRICT JUDGE